(No. 4560—

JOHN W. MARTIN, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed April 21, 1955.*

EDWARD F. O'MALLEY AND JOHN J. DRISCOLL, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

FEARER, J.

On July 20, 1953, claimant filed his complaint for personal injuries in this Court. The claim grew out of an accident, which occurred in the City of Collinsville, Madison County, Illinois, on August 11, 1952, somewhere between the hours of 9:30 and 9:45 A.M. Claimant, on said date, was employed by the Associated Retailers,

who operated a delivery service out of St. Louis, Missouri, and his duties consisted in assisting the driver to arrange and deliver parcels.

On said date, Robert Povilat was employed by the State of Illinois as a temporary equipment operator in the Division of Highways, and was driving at said time a 1941 two and a half ton International dump truck.

At the time of the accident, Robert Povilat was acting within the scope of his employment, and as an agent and servant for respondent. On the morning in question, he had driven to the Highway Garage at French Village, a distance of approximately ten miles from Collinsville, for the purpose of getting wrenches and supplies for doing certain maintenance work. Riding with Mr. Povilat were two assistants, who did not testify at the time of the hearing before the Commissioner.

The undisputed facts are that it had been raining the morning of the accident, the pavements were wet, and at the time of the accident it was still misting. As respondent's truck was being driven into Collinsville on U. S. Highway No. 40, which was also known as St. Louis Road, and traveling in a northerly direction in a residential zone, there was parked a few inches from the curb, facing in a northerly direction, a 1950 Dodge panel ton and a half truck, which was a delivery truck owned by the Associated Retailers. This truck was parked in front of the residence at 718 St. Louis Road, where a delivery was being made. At the time of the accident, claimant was facing south, standing inside of the truck rearranging parcels for delivery.

St. Louis Road, upon which the panel truck was parked, and respondent's truck was being driven, is a four lane highway. As respondent's truck approached the panel delivery truck, there was a semi-trailer truck

coming from the north and traveling south, which respondent's witnesses testified was traveling in the center of the street. As the driver of respondent's truck was passing, or attempting to pass the panel truck parked by the curb, the semi-trailer truck, traveling in a southerly direction towards the center of the street, made it appear that respondent could not pass safely. When within seventy-five feet of the panel truck, Povilat applied the brakes on respondent's truck causing it to veer to the right a few feet, so that the middle portion of the truck struck the panel portion on the left side of the truck parked at the curb, throwing claimant against a metal seat in the front part of the panel truck.

Mr. Povilat, the only witness, and the driver of respondent's truck, testified that, where the panel truck was parked, the street was straight, and you could see a distance of at least six hundred feet in either direction. He testified that he had driven the said truck that morning since about 8:00 A.M., and had had occasion to use the brakes several times, and that they had not grabbed or caused the truck to veer in either direction, but that the truck had been sitting out in the rain all of the night before.

From the evidence, it is apparent that Mr. Povilat, the agent driving respondent's truck, was guilty of negligence in not allowing the semi-trailer truck to pass the panel truck, parked at the curb, before he pulled respondent's truck to within seventy-five feet of the panel truck, and then attempted to pass; and, seeing that he could not pass safely, he applied the brakes. It is apparent to us that the proximate cause of claimant's injuries was the poor judgment of the driver of respondent's truck in driving as close as he did to the panel truck in which claimant was standing, and did

not do what an ordinarily careful person would have done under the same or similar circumstances, as the distance which the said truck veered was only about two feet.

There was nothing that claimant could do to avoid this accident, as he was standing inside of the truck, and could not see cars coming in either direction. The truck in which he was standing was parked within a very few inches of the curb, and, from the record, it was an area or zone in which parking could be made on either side of the street. This was a street at least forty feet in width, being a four lane highway, and probably was wider. However, there is nothing in the record to indicate the exact width of the street from curb to curb.

From a factual and legal situation, we find no problem in arriving at our decision as to the right of recovery. The only question that presents itself is the question of the amount of the award.

On the day of the accident, claimant was taken to the office of Dr. Robert Breaves, a practicing physician in Collinsville, who recommended that X-Rays be taken of claimant's neck, and also prescribed medication. However, Dr. Breaves did not testify. Claimant waited a couple of days, and then went to Dr. Kane, a practicing physician in East St. Louis, who sent him to Dr. Kilian Fritsch for X-Rays. Dr. Bihss took several X-Rays at the request of Dr. Fritsch. Claimant first saw Dr. Fritsch on August 15, 1952, and continued under his care until March of 1953.

Dr. Fritsch testified that he was a Specialist in Bone and Joint Surgery, and that he first saw claimant on August 15, 1952, and prescribed the taking of X-Rays. His examination at that time revealed that Mr. Martin, the claimant, held his neck rigid and stiff, as there was

no motion in his neck; and that he referred to pain in his shoulders. Claimant gave him the history of the automobile accident on August 11, 1952, which was four days prior to his examination. At that time there was about ten degrees of flexion of the neck, with no extension at all. He prescribed medication for pain and application of hot towels, it being his opinion that he had sustained some injury to the bone structure in his neck, or a dislocation, which was confirmed by X-Rays. In reading the X-Rays, there was a subluxation of the third cervical vertebra on the fourth. When claimant returned on the 18th day of August, three days after his first visit, Dr. Fritsch ordered that he wear a head sling, which was prescribed for the neck traction to be used at home. This he continued to wear, and remained under the doctor's care until he was fitted for a Thomas collar. Subjective findings were that there was tenderness in the neck, and limitation of motion in the neck. Claimant complained of tenderness, and pain in the arms, shoulders and neck. In the month of October, claimant still had pain in his shoulders, and the doctor applied ethyl chloride, and ordered that he wear shoulder braces, which were equipped with a strap across the front to pull the shoulder blades together, so as to absorb the strain off of the rhomboid muscles. Also, in the month of October, 1952, an injection of novocain was made between the shoulder blade and spine. At that time he was still wearing the collar. In the. latter part of October, 1952, when the doctor next saw him, claimant had lost about forty pounds, and was still wearing the shoulder braces and the Thomas collar. At that time he found that the pain in his arm had almost cleared up, but that he still had trouble sleeping nights, and was still taking medication for pain and

sleep, particularly to relax the muscle spasm. He was again seen by the doctor on November 4, 1952, and there was still limitation of motion in the neck. He again complained of occasional pain in his right arm, and of trouble sleeping at night. Claimant was advised to wear a towel around his neck at night, and to take off the collar while sleeping.

He was next seen on November 18, and at that time was advised that he could return to work. Claimant returned to the doctor on November 24, and stated that he had tried to return to work, but was unable to continue, because of the jolting of the truck, which caused pain in his neck and shoulder. The doctor manipulated his neck at that time, and prescribed that he continue to wear the Thomas collar, and sleep with a towel around his neck at night.

He was next seen on December 9, and was found to be somewhat better. He was advised to increase the use of traction from two to three times a day, because of the pain in his back, and he was put on a schedule of rest for both morning and afternoon.

On December 16, his condition was improved, and he was going part of the time without the Thomas collar. He still continued to wear the shoulder braces, and was still taking medication. He was seen again in January of 1953, and appeared to be much better. He was not wearing the Thomas collar, but still had not returned to work. In February of 1953, he was released to return to work. He came back to the office in March of 1953, and stated that he still could not work, but that he was much better, although his neck still bothered him, and he had trouble with his shoulders. This was the last time that he was seen by the doctor.

The doctor testified that he saw John Martin approximately seventeen times, and that he had rendered a bill for his services in the amount of $120.00. He was asked to render an opinion, based upon his findings, as to permanency, particularly residual disability, and answered that "Claimant would have some permanent".

On cross-examination, he referred to the subluxation as being a slight dislocation; that he didn't find any fractures, and found very little evidence of arthritis; that the fourth cervical vertebra, which is above the shoulder, was out of place, and that it was probably a pressure on the nerve between the fourth and fifth cervical vertebra, which caused the pain in claimant's shoulder. He stated that there was a marked muscle spasm when claimant first came to him, which had improved, and that claimant had fairly good motion of the neck. Upon examination, he found no bruises or marks on claimant's neck or back, and no external signs of any other injuries. He further testified that, when claimant came into his office for the last time, he was seen by his associate, Dr. Hill, and that the only thing he knew about this visit was that claimant had stated he still could not work.

The only special damages testified to are as follows:

| | |
|---|---|
| Dr. Kilian Fritsch, medical bill | $120.00 |
| Dr. F. E. Bihss, for X-Rays | 70.00 |
| Thomas collar | 25.00 |
| Shoulder braces | 6.63 |
| Head sling | 8.35 |
| Total | $230.48 |

In regard to loss of earnings, it is rather difficult to arrive at an accurate figure. Claimant testified that he was earning $65.00 a week, in addition to overtime. Ten hours a week overtime at $2.00 an hour would

amount to $85.00 a week. He stated that he did not work overtime every week, but on the Saturdays that he worked, in addition to his regular work, he earned an additional $20.00, making his total earnings for the week the sum of $85.00.

On page 16 of the transcript, there is a summary of claim for loss of earnings, wherein claimant testified that for a period of four and a half months he did not work for anyone else, that he was not able to work at all, and that by lifting he experienced pain in his shoulders and neck. Between August 11, 1952 and March, 1953, which was the last time that he saw the doctor, he had been out of employment for 28 weeks. However, during that time he worked for a period of four weeks. His wages varied between $65.00 and $110.00 a week, depending upon overtime.

On cross-examination, claimant contended that he was not employed at the present time, and that he had not been employed since the date of the accident, except for the four week period. On further cross-examination, claimant gave his address as Route 1, Patton, Missouri, and stated that he was living on a 160 acre farm, which he owned, and that his wife was operating a tavern. He further stated he had been working in the tavern for his wife since the accident, but did not receive regular pay, and that he had another man living on the farm to take care of the livestock. He did state that he was able to do work in the tavern since the date of the accident.

At the time of the hearing, claimant gave his age as 41 years.

There was introduced in evidence as respondent's exhibit No. 1, a covenant not to sue in the amount

of $2,000.00, signed by claimant and his wife, and given to Robert Povilat, the driver of respondent's truck.

As was stated previously, it is our opinion that there is no question as to the liability of respondent. However, there is some question in our minds as to the loss of earnings, and claimant's ability to work from the date of the accident. His testimony that he had been assisting his wife in tending bar in her tavern should be taken into consideration, even though he testified that his wife had not paid him for services rendered.

In arriving at the amount of the award for claimant, we are taking into consideration the amount previously paid to him, as represented by the covenant not to sue, which was executed on April 22, 1953, wherein $2,000.00 was paid to claimant, and it is our opinion that an award should be made in addition thereto in the sum of $750.00.